**State v. Penson**
**Case No. 9193**
**Montgomery County, (2nd)**
**Decided February 26, 1990**
**[Cite as 1 AOA 81]**

*Lee C. Falke, Montgomery County Prosecutor, By Lorine M. Reid, Assistant County Prosecutor, Appellate Division, Post Office Box 972, 451 West Third Street, Dayton, Ohio 45422, Attorneys for Plaintiff-Appellee*

*Randall M. Dana, Gregory L Ayers, George A. Lyons, George H. Lancaster, Jr. Ohio Public Defender Commission, Eight East Long Street, 11th Floor, Columbus, Ohio 43266-0587, Attorneys for Defendant- Appellant*

GRADY, J.

This case is before us on remand from the United States Supreme Court. In this appeal we are asked to review Appellant Penson's seven assignments of error concerning the proceedings of the trial court. We overrule Appellant's assignments of error concerning the racial composition of the jury, the trial court's instructions concerning sexual offenses and complicity, and the court's omission of the deadly weapon/dangerous ordnance element from its charge on felonious assault. We also overrule the assignments of error concerning operability of a firearm and the instructions pertaining to that matter. Those alleged errors were presented in assignments one through six. We have sustained assignment seven upon the trial court's failure to follow the jury's finding that Appellant had a prior felony conviction.

### I.
### Posture of the Case

On August 4, 1984 James Jones, his wife Deborah Jones, and their two children were living at 1947 Fairport Avenue, Apartment 104 in Montgomery County. James Jones' sister Mary Jones, and her son, also lived there.

Sometime after 12:30 a.m. on the morning of August 4th, Steven Penson, Richard Brooks, and John Albert Smith, Jr. broke into the Jones' apartment. Shortly after Penson entered the apartment by breaking through a bedroom window, Brooks and Smith kicked in the front door of the apartment and came inside. Penson, wielding a pistol, demanded money and began searching the pockets of a coat belonging to James Jones. Over the course of the next one to two and one-half hours the three men sexually assaulted, sodomized and brutalized the adult occupants, forcing them to perform various acts upon each other and the defendants, including vaginal and anal intercourse, and oral sex. During the ordeal the defendants threatened to shoot off various body parts of James Jones, hit him about the head with a pistol, and repeatedly threatened to kill the three adult occupants. Before leaving the apartment the men took several items belonging to the occupants, including an am-fm cassette tape player and about $200 in food stamps. Brooks remained behind under orders from Penson to kill James and Deborah Jones. Unable to do so, Brooks ordered them to count to two thousand and then left the apartment.

After the assailants left, James Jones went upstairs to a neighbor's apartment and called the police. The police arrived and took James, Deborah and Mary to Good Samaritan Hospital for medical treatment. James required treatment for lacerations on his head, and Mary and Deborah underwent a complete physical examination, including a pelvic examination.

On August 10, 1984 the Montgomery County Grand Jury returned an indictment against Penson, Smith and Brooks for raping Deborah Jones, a violation under R.C. 2907.02 (A) (1). A firearms specification accompanied this charge. On August 14, 1984 the Grand Jury indicted the three defendants on twenty-seven additional counts including twenty counts of rape, one count of aggravated burglary, two counts of aggravated robbery, two counts of felonious assault, one count of felonious sexual penetration, and one count of gross sexual imposition. Each count carried a firearms specification in accordance with R.C. 2929.71. On August 21, 1984 the Grand Jury added specification against Appellant according to R.C. 2923.13 (A) (2) for possession of a firearm under disability. Appellant previously pleaded guilty to felonious assault, *State* v. *Steven Anthony Penson* (C.P. May 13, 1975), Case No. 75 CR 144.

Penson, Brooks and Smith were tried jointly before a jury, the trial lasting from November 26 to December 5, 1984. On December 7, 1984, the jury returned verdicts against Penson finding him guilty of fourteen counts of rape (Count One, Counts Ten through Seventeen, and Counts Twenty-two through Twenty Six), guilty of aggravated Burglary (Count Two), guilty of two Counts of Aggravated

Robbery (Counts Three and Four), guilty of two counts Aggravated Assault (Counts Five and Six), guilty of attempted rape (Count Eight), and guilty of Gross Sexual imposition (Count Nine). Each count carried a firearms specification. Additionally, the jury found Penson guilty of possessing a firearm under disability (Count Twenty-Nine).

The trail court filed an Entry and Order on December 27, 1984 sentencing Appellant to the Chillicothe Correctional Institution for a term of not less than fifteen years nor more than twenty-five years on Counts One through Four, Ten through Seventeen, and Twenty-two through Twenty-six. The trial court also sentenced Penson to a term of not less than twelve years nor more than fifteen years on Counts Five, Six and Eight, and not less than three years nor more than five years on Count Twenty-Nine. The trial court order Penson to serve these sentences consecutively. The court imposed an additional term of three years actual incarceration for the firearms specification. This sentence was to be served consecutively with the other sentences imposed in 84 CR 1056. An Amended entry and order filled January 9, 1985 mandated that all sentences pertaining to the rape counts be actual incarceration.

Penson filed a timely notice of appeal from the judgment and sentence of the trial court. On June 2, 1986 Appellant's counsel filed an *Anders* brief stating he could find no meritorious issue for consideration by this court. By Decision and Entry filed June 9, 1986 this court allowed appointed counsel Douglas Shaeffer to withdraw and granted Penson an additional thirty days to file his own brief, pro se. We granted Appellant a further extension on June 27, 1986. On July 24, 1986 we granted Appellant's request for the loan of the transcript along with an extension of an additional sixty days to complete his brief. We granted yet another sixty day extension on September 15, 1986. On November 13, 1986 this court overruled Penson's request for appointment of counsel and granted an additional fifteen days to use the transcript. In November 13th Decision and Entry this court also granted a final extension of twenty-five days to file a brief. Penson did not file a brief at the end of twenty-five days.

In Accordance with the duties imposed upon this court by *Anders* v. *California* (1967), 386 U.S. 738, we undertook a full examination of the record to determine if Appellant received a fair trial. See also, *State* v. *Toney* (1970), 23 Ohio App. 2d 203. We expressed some concern in our initial opinion about Appellant's counsel filing an *Anders* brief, particularly considering the claims raised on appeal by Penson's co-defendants. See, *State* v. *Steven Anthony Penson* (June 5, 1987), Montgomery App. No. 9193, unreported. See also, *State* v. *John A. Smith* (May 13, 1987), Montgomery App. No. 9168, unreported, and *State* v. *Richard Brooks* (June 4, 1987), Montgomery App. No. 9190, unreported.

Upon reviewing the Appellant's conviction we found only one issue requiring our attention. Due to the trial court's failure to instruct the jury properly as to an element in Count VI, felonious assault of Deborah Jones, and the absence of evidence to support conviction on the charge, we reversed the Appellant's conviction. *State* v. *Steven Anthony Penson* (June 5, 1987), Montgomery App. No. 9193, unreported. The evidence presented did not, as a matter of law, support conviction on that count. *Id.* However, we sustained Appellant's conviction on all other counts.

Appellant filed Notice of Appeal to the Ohio Supreme Court on July 6, 1987. On October 21, 1987 the Ohio Supreme Court, *sua sponte*, filed an Entry dismissing Appellant's appeal for want of a constitutional question.

On December 21, 1987 Appellant filed a petition for Writ of Certiorari to the United States Supreme Court. The Supreme court granted Certiorari on February 22, 1988. In its decision, rendered November 29, 1988, *Penson* v. *Ohio* (1988), 109 S.Ct. 346, the Supreme Court reversed the judgment of this court and remanded the case to us for further consideration consistent with its opinion. The Supreme Court found that we denied Appellant his constitutional right to appeal by allowing Appellant's counsel to withdraw and refusing to appoint new counsel. The Supreme Court concluded that we failed to satisfy the requirements set out by the Court in *Anders* v. *California* (1967), 386 U.S. 738. *Penson* (1988), 109 S.Ct. at 354.

The case is now before us on appeal on remand from the decision of United States Supreme Court. Appellant is represented by counsel and submits seven assignments of error.

## II
Racial Discrimination in Selection of the Jury

Appellant states in his first assignment of error:

PENSON WAS DENIED HIS FOURTEENTH AMENDMENT RIGHT TO EQUAL PROTECTION AND SIXTH AMENDMENT RIGHT TO AN IMPARTIAL JURY COMPOSED OF A FAIR CROSS-SECTION OF THE COMMUNITY WHEN THE PROSECUTION USED PEREMPTORY CHALLENGES TO EXCUSE ALL OF THE BLACK VENIREPERSONS FROM THE PETIT JURY.

The United States Constitution prohibits practices that purposefully exclude members of cognizable racial minorities from juries. On more than one occasion the Supreme Court has invalidated practices that exclude racial minorities from jury duty. See e.g., *Strauder* v. *West Virginia* (1880), 100 U.S. 303; *Hollin* v. *Oklahoma* (1935), 295 U.S. 394 (per curium); *Avery* v. *Georgia* (1953), 345 U.S. 559; *Swain* v. *Alabama* (1965), 380 U.S. 202; *Jones* v. *Georgia* (1967), 389 U.S. 24 (per curium); *Rose* v. *Mitchell* (1979) 443 U.S. 545; *Batson* v. *Kentucky* (1986), 476 U.S. 79. The use of peremptory challenges by prosecutors for the sole purpose of excluding a cognizable racial group from a jury falls within the ambit of practices the Constitution seeks to eradicate. See generally, *Batson, supra.* Such practices not only violate a criminal defendant's right to equal protection but also undermine public confidence in the justice system. *Id.* at 86 & 87. Courts may not tolerate the use of peremptory challenges to exclude racial minorities from juries. *Brown* v. *North Carolina* (1986), 107 S.Ct. 424 (O'Connor, J. concurring). Yet, we must note that the Constitution does not bestow upon criminal defendants an absolute right to a jury that represents a fair cross-section of the community. The Constitution simply does not require such a jury. *Teague* v. *Lane* (1989) 109 S.Ct. 1060, 1069. Cf., *Holland* v. *Illinois* (1990), 58 U.S.L.W. 4162.

Prior to the Supreme Court's *Batson* decision, criminal defendants had to show that race-based jury selection reflected systematic attempts to exclude minorities.[1] See e.g., *Swain, supra.* This evidentiary hurdle effectively precluded individual equal protection claims concerning the use of race-based peremptory challenges. However, in *Batson,* the Supreme Court modified earlier decisions and lower the evidentiary hurdle first set up in *Swain.* In place of showing systematic race-based jury selection, a criminal could challenge a prosecutor's use of peremptory challenges by making a prima facie case of race-motivated peremptory strikes.

Under *Batson,* a criminal defendant can establish a prima facie case of purposeful racial discrimination in the use of peremptory challenges by showing three things. First, the criminal defendant must show that he is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to exclude members of that group. *Batson, supra,* at 96. Second, the criminal defendant may rely on the fact, "to which there can be no dispute," that the prosecution exercised its peremptory challenges in such a manner as to constitute a discriminatory jury selection practice. *Id.* Finally, the criminal defendant must show that "these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude veniremen from the petit jury on account of their race." *Id.* Only *after* the criminal defendant meets this burden must the prosecution then provide a reasonable explanation for the use of its peremptory challenges in what, at first glance, appears to be a race-based manner. *Id.* at 97.

While the *Batson* decision lowered the evidentiary hurdle criminal defendants must cross in establishing a racially motivated use of peremptory challenges, the decision did not relieve defendants of the obligation of providing sufficient evidence to establish a prima facie case. The *Batson* decision is clear on this point: only *after* the criminal defendant establishes a prima facie case of discrimination will the burden shift to the prosecution to explain its use of peremptory challenges. *Batson, supra,* at 97. See also, *Booker* v. *Jabe* (C.A.6, 1985), 775 F.2d 762, 773.

What constitutes a prima facie case of discrimination in jury selection is not absolutely clear. We glean some guidance by referring to the Sixth Circuit's opinion in *United States* v. *Sangineto-Miranda* (C.A.6, 1988), 859 F.2d 1501. In *Sangineto- Miranda* Benjamin Nelson, a black defendant, objected to the prosecutor's use of peremptory strikes against black jurors. Nelson contended the prosecution used its peremptory challenge in a racially motivated manner to strike black jurors. However, the only evidence Nelson offered to support this claim was that the Government used its peremptory challenges only against blacks. The district court held that the defendant did not make out a prima facie case of purposeful

discrimination. *Id.* at 1521. In upholding the district court, the appeals court stated:

> The only evidence that Nelson proffers in support of his prima facie case is the fact that all the Government's peremptory challenges were against blacks. Although the record supports this contention, standing alone it does not raise the necessary inference of purposeful discrimination. In reaching this conclusion, we emphasize the important role that the district court plays in making this assessment, and this court's deference to that finding.
>
> *We reject Nelson's underlying premise that an inference of intentional discrimination will always arise if, without more, there is a showing that the prosecution used all its peremptory challenges to exclude blacks. We reject such a per se rule,* particularly because it does not take into account considerations that may be very relevant, including the percentage of the racial group in the district jury pool or original jury; the number strikes available to the government; and the composition of the ultimate jury sworn. (Emphasis supplied) *Sangineto-Miranda, supra* at 1521.

Thus, while the criminal defendant need not show the broad systematic exclusion originally required by *Swain,* neither can the defendant establish a prima facie case merely by asserting the prosecution used its peremptory challenges for an invalid raced-based purpose. Bare assertions do not make a prima facie showing of purposeful discrimination.[2]

We find this case similar to *Sangineto-Miranda.* In both this case and *Sangineto-Miranda* the only evidence offered by the parties is the assertion that the prosecutor used his peremptory challenges in a race-based manner. The record establishes that in chambers Mr. Rab, Smith's attorney, Mr. Schwarz, Brook's attorney, and Mr. Monta, Penson's attorney, raised the following challenge:

IN CHAMBERS:
MR. RAB: On behalf of Defendant Smith, I wish to challenge the venire on the grounds that of all the prospective jurors that we had there were only two blacks on it and they were both seated and both challenged by the prosecutor and thereby denying this defendant representation of his own race on the jury and denying him the right to a trial by jury by all of his peers and there has been in my opinion, a systematic exclusion of blacks on the jury.

MR. SCHWARZ: I would join in that motion and add that the jurors who were on the jury list that I had out there were a hundred and one jurors on that list and we have only been through about forty or forty five of that but I don't know of any other black jurors and there were numerous absences for no reason that I know of other than they just didn't show up. I don't know the reason for exclusions and that is now within our ability find out. We would join him in that we feel a person is getting a fair trial by his appearance.

MR. RAB: I would join him in that.

MR. MONTA: On behalf of Defendant Penson, we would join in the original motion and the amended motion for the record and indicated that the racial make up of the jury is entirely non negroid and the defendant's, for the record, are all negroes. (T. 149-150).[3]

This exchange represents the only time at trial that counsel for Appellant and his co-defendants raised the issue of the racial composition of the jury. In fact, the record demonstrates that just before the conference in chambers the defendants stated that they were "satisfied with the jury as seated." (T. 148).

The record does not reflect the number of persons in the venire called or its racial composition. Appellant asserts, without contradiction, that only two of that group were black, Appellant's own race. Thirty-five veniremen, including the two blacks, were seated for voir dire. Six of them were excused for cause by the court. The prosecution excused six, including the two blacks, through peremptory challenge. The three co-defendants exercised eleven peremptory challenges.

The state has asserted the identity of the two black jurors it excused, arguing that its grounds were not motivated by racial considerations. One of the two, Jacqueline Williams, stated in voir dire that she was displeased with the way in which officers of the Dayton Police Division investigated a crime of which she was a victim (Tr. 33). The same police division was involved in Appellant's case. The second black veniremen, John Thomas,

stated that he was acquainted with Appellant's mother (Tr. 117).

We find that Appellant failed to show a prima facie case of discrimination under *Batson*. The focus of the relevant inquiry is not result but the process that produced the result. Nothing in the pattern of peremptory challenges exercised by the prosecutor reflects purposeful attempts to exclude blacks as a group. The bare assertion of counsel, without more than presented here, did not make a prima facie case and did not warrant further inquiry by the court.

In addition to arguing that the prosecutor violated his Fourteenth Amendment right to equal protection, Appellant also argues that the prosecutor violated his Sixth Amendment right to a jury composed of a fair cross-section of the community. While we do not deny that a criminal defendant is entitled to trial by a jury that is "drawn from a source fairly representative of the community," *Taylor* v. *Louisiana* (1975), 419 U.S. 522, 538, we must point out that the Constitution does not entitle a criminal defendant to a jury that precisely represents a cross-section of the community. *Teague* v. *Lane* (1989), ___ U.S. ___, 109 S.Ct. 1060, 1069. See also, *Lockart* v. *McCree* (1986), 476 U.S. 162; *State* v. *Roe* (1989), 41 Ohio St.3d 18, 21. Further, the right to an impartial jury composed of members that reasonably represent a cross-section of the community does not relieve Appellant of the burden of making a prima facie case of purposeful discrimination.[4] Even *Booker* v. *Jabe* ( C.A.6, 1985), 775 F.2d 762, which Appellant reminds us is "binding precedent in the Sixth Circuit," emphasizes the requirement that at the very lease the criminal defendant must make a prima facie case of a Sixth Amendment violation. *Id.* at 773. As the court stated in *Booker*, "Only if the moving party establishes a prima facie showing of systematic abuse of peremptory challenges . . . does the burden shift to the non-moving party to respond to any inquiry concerning its exercise of that right." *Id.*

The facts necessary for this determination are even less clear. The objection goes to the entire array of persons called for jury service, and its focus is the method of their selection. Counsel provided no information concerning that matter. The trial court had no duty to make further inquiry, particularly after counsel accepted the jury and it was sworn.

We hold that Appellant did not establish a prima facie case of purposeful or systematic discrimination in the prosecutor's use of peremptory challenges. The trial court did not err in failing to make further inquiry into the matter.

We overrule Appellant's first assignment of error.

## III.
## Jury Instruction on Rape/
## Ineffective Assistance of Counsel

Appellant states in his second assignment of error:

A. THE TRIAL COURT COMMITTED PLAIN ERROR BY FAILING TO INSTRUCT THE JURY AS TO THE PARTICULAR TYPE OF SEXUAL CONDUCT THE JURY MUST FIND FOR EACH COUNT OF RAPE AND THAT BEFORE IT COULD FIND THE DEFENDANT GUILTY, IT MUST UNANIMOUSLY AGREE AS TO THE SPECIFIC ACT OF SEXUAL CONDUCT THAT THE DEFENDANT ENGAGED IN WITH RESPECT TO EACH COUNT OF RAPE. THESE ERRORS DENIED PENSON HIS DUE PROCESS RIGHTS TO AN UNANIMOUS JURY VERDICT ON EACH COUNT, TO BE PROVEN GUILTY BEYOND A REASONABLE DOUBT OF EACH RAPE OFFENSE, AND TO ADEQUATE AND EFFECTIVE APPELLATE REVIEW OF HIS CONVICTIONS, IN VIOLATION OF ARTICLE 1, SECTION 5 AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION AND THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

B. DEFENSE COUNSEL'S FAILURE TO REQUEST THESE INSTRUCTIONS DENIED PENSON HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION AND THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

### A. *Jury Instructions*
The Supreme Court has held that juries considering a rape charge need not be instructed to make a specific finding about the type of sexual conduct committed by a criminal

defendant charged with rape. *State* v. *Thompson* (1987), 33 Ohio St. 3d 1. The Court stated:

> * * * the jury had only to find that one of these forms of sexual conduct took place between the victim and appellant to find that a rape had been committed. The statute simply does not require, as appellant asserts, that a specific finding be made as to the *type* of rape. Consequently, it was not error for the trial court to refuse to instruct the jury that it must make such a specific finding. The fact that some jurors might have found that appellant committed one,but not the other, type of rape in no way reduces there liability of appellant's conviction, because a finding of either type of conduct is sufficient to establish the fact of rape in Ohio. *Id.* at 11.

*Thompson* involved a single count of rape and proof of multiple sexual acts, each one of which might support a conviction for rape. This case involves multiple counts and proof of multiple acts. The trial court instructed the jury:

> Before you can find a defendant guilty of *a count* of rape you must find beyond reasonable doubt that * * * the defendant engaged in sexual conduct with another who was not the spouse of the defendant and defendant purposely compelled the other person to submit by force or aided or abetted his co-defendant in doing so. (Emphasis supplied) (T. 681).

The Court then went on to define "sexual conduct" and the intent necessary to commit rape. (Tr. 682).

The rule of *Thompson* does not require the court to identify specific sexual acts in relation to the charges and does not require the jury to find specific sexual acts in support of its verdict. The court's instruction (Tr. 682-683) was sufficiently clear to cause the jury to apply a discrete act to each charge. The rule of unanimity requires a unanimous verdict, but requires only substantial agreement among jurors about the conduct supporting the verdict. *United States* v. *Gibson* (C.A. 5, 1977), 553 F.2d 453. The affirmative assent expressed by each juror in the poll (Tr. 706) belies any charge of confusion or redundancy.

The trial court did not err in failing to instruct the jury as to particular acts of sexual conduct as requested by Appellant. Neither did Penson's counsel fail to provide effective representation in not requesting such instructions.

Appellant's second assignment of error is overruled.

## B. *Inadequate Representation of Counsel*

Appellant argues that his trial counsel's failure to request a bill of particulars and more specific instructions as in part "A", above, constituted inadequate representation.

To establish inadequate assistance of counsel a criminal defendant must show (1) that defense counsel's representation "fell below an objective standard of reasonableness," *and* (2) counsel's poor representation prejudiced the outcome of the trial. *Strickland* v. *Washington* (1984), 466 U.S. 668, 687.[5] The burden of showing ineffective assistance of counsel rests with the defendant so claiming. *Id.* at 688. See, also, *State* v. *Malone* (December 13, 1989), Montgomery App. No. 10564, unreported.

In determining whether counsel's performance violated the first prong of the *Stricland* test, the court must examine the totality of circumstances in a given case. *Id.* at 690, 695. Courts must strongly presume that defense counsel conscientiously performed his duty. *Id.* at 690.

In addition to showing counsel's poor performance, the criminal defendant must also show that, but for the poor performance, the outcome of the trial would have been different. As the Court stated:

> It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test, and not every error that conceivable could have influences the outcome undermines the reliability of the result of the proceeding. * * * The defendant must show that there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different . *A reasonable probability is a probability sufficient to undermine confidence in the outcome.* (Emphasis supplied). *Id.* at 693, 694.

The *Strickland* analysis is a similar to the

analysis adopted in Ohio and thus controls our analysis of Appellant's claim. See, *State* v. *Smith* (1985) 17 Ohio St. 3d 98; *Lyte, supra.*

As suggested by the Supreme Court in *Strickland*, we first look to whether the alleged deficiencies in counsel's performance prejudiced the outcome of the trial. We find that it did not.

We find no reasonable probability that counsel's failure to request a bill of particulars prejudiced the outcome of the trial. The purpose of a bill of particulars is to set forth specifically the nature of the offense charged when the indictment is deficient in that respect. *State* v. *Chaffin* (1972), 30 Ohio St. 2d 13. When the indictment adequately informs the accused of the nature of the offense charged, the accused is not entitled to a bill of particulars. *State* v. *Halleck* (1970), 24 Ohio App. 2d 74. That need is determined by the facts of the case. *State* v. *Petro* (1947), 148 Ohio St. 473.

Appellant has not shown how his position was prejudiced by the lack of a bill of particulars. The purpose of the bill is not discovery. *Chaffin, supra.* Appellant had his discovery opportunities. Appellant's position at trial was that he did not commit any of the alleged crimes or acts and wasn't there at all. The state of the indictment did not inhibit the presentation of that defense.

In view of our prior finding in part "A", we find that no *Strickland* prejudice could result from trial counsel's failure to request instructions specifying the type of sexual conduct involved.[6]

Appellant fails to demonstrate either prejudice or objectively unreasonable assistance of counsel.

For the reasons stated above, we overrule Appellant's second assignment of error in its entirety.

### IV.
### Jury Instruction on Complicity

Appellant's third assignment of error states:

> THE TRIAL COURT ERRED IN INSTRUCTING THE JURY THAT IN ORDER TO DETERMINE WHETHER A DEFENDANT WAS GUILTY OF COMPLICITY IN AN OFFENSE, THE JURY SHOULD "CONSIDER WHICH OF THE DEFENDANTS WAS THE ACTUAL PARTICIPANT IN COMMITTING THE OFFENSE" AND WHETHER THE REMAINING DEFENDANTS AIDED AND ABETTED THE "ACTUAL PARTICIPANT" IN THE OFFENSE, THEREBY DEPRIVING PENSON OF DUE PROCESS OF LAW IN VIOLATION OF ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION AND THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

A reviewing court should never judge the propriety of a single jury instruction in isolation. Rather, in determining whether a jury instruction violated some norm, a reviewing court must look at the contents of the overall charge. *Cupp* v. *Naughten* (1973), 414 U.S. 141. See also, *State* v. *Price* (1979), 60 Ohio St. 2d 136, 141 ("We reject appellant's suggestion that we parse isolated clauses and in doing so artificially determine the instruction to set forth an unconstitutional presumption."); *State* v. *Jenkins* (1984), 15 Ohio St. 3d 164 (Prejudice of a charge must be determined from the entire record.); *State* v. *Simms* (1983), 9 Ohio App. 3d 302; *State* v. *Brooks* (June 4, 1987), Montgomery App. No. 9190, unreported (A single jury instruction may not be judged in artificial isolation.).

The trial court gave the following instruction to the jury on the offense of complicity:

> When you consider each count on the indictment that charge that all three defendants committed it, consider *which of the defendants was the actual participant in committing the offense and then consider if each of the other two aided and abetted the actual participant in committing the offense*, with the same degree of culpability required to commit the offense, that is, with purpose or knowingly. (Emphasis supplied.)

Appellant's counsel joined a specific objection to this jury instruction both before closing arguments (T. 600), and after the court read it to the jury. (T. 695).

The instruction on complicity given by the trial court varied slightly from the instruction provided in the Ohio Jury Instructions.[7] However, as stated, a jury instruction cannot be examined in isolation. When we examine this particular instruction in the totality of the charge, it is clear the jury received proper guidance from the court. In addition to the

complicity instruction the court gave the jury the usual instructions on presumption of innocence and reasonable doubt.[8] Further, the court instructed the jury that it had to consider the evidence in relation to each defendant. (T. 685-687).

Appellant argues that the instruction, in effect, directed a verdict against him on the charge of complicity because, by its wording, the instruction appears to suggest that at least one the defendants was a principal. Appellant argues the jury could have reasonably concluded that it need not find Appellant guilty beyond a reasonable doubt. Such an instruction would violated the Appellant's constitutional rights if in fact it amounted to a directed verdict. *U.S. v. Martin Linen Supply Co.* (1977), 430 U.S. 564 (A trial judge is prohibited from entering a judgment of conviction or directing a verdict against a criminal defendant.).

However, as stated above, we must examine the jury instruction in the totality of the jury charge. Although the wording of the jury instruction varied from that contained in Ohio Jury Instructions, the trial judge nevertheless properly allocated the burdens of proof and correctly instructed the jury on its responsibilities through the entire scope of his charge. See, e.g., *supra* at note 7. It is clear to us that the variance in the complicity instruction did not direct a verdict against Appellant.

Appellant's third assignment of error is overrule.[9]

### V.
### Firearms Specification/Firearms Possession Under Disability

Appellant's fourth and fifth assignments of error raise entertwining issues concerning possessing a firearm. We will consider them together. Appellant states:

> IV. THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY THAT THE STATE HAD THE BURDEN OF PROVING THE FIREARMS SPECIFICATION, R.C. 2929.71, BEYOND A REASONABLE DOUBT, THEREBY DEPRIVING PENSON OF DUE PROCESS OF LAW IN VIOLATION OF ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION AND THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

> V. THE TRIAL COURT ERRED IN CONVICTING AND SENTENCING PENSON FOR THE OFFENSE OF HAVING A WEAPON UNDER DISABILITY, R.C. 2923.13, AND A FIREARMS SPECIFICATION, R.C. 2929.71, BECAUSE THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT THAT HE HAD A "FIREARM" AS DEFINED IN R.C. 2923.11, THEREBY DENYING PENSON DUE PROCESS OF LAW IN VIOLATION OF ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION AND THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION.

#### A. Jury Instruction Concerning Firearms Specification

As we discussed above in Appellant's third assignment of error, the propriety of a single jury instruction cannot be judged in isolation from the entire jury charge. For, as the United States Supreme Court unequivocally stated in *Cupp, supra,* at 146-147:

> [W]e accept at the outset the well-established proposition that a single instruction a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.

See also, *Price, supra,* at 141, quoting *Cupp, supra,* at 146-147.

Appellant argues that the trial court erred when it failed to instruct the jury that the State had to prove the firearms specification beyond a reasonable doubt. Appellant argues that the trial court violated his constitutional rights by enabling the jury to find him guilty of the specification on a standard of proof less than that of reasonable doubt.

The record indicates that the trial court did not *specifically* instruct the jury that the State had to prove Appellant guilty of the firearms specification beyond a reasonable doubt. However, at no less than nine times during the charge the trial court clearly set out the proper standard of proof. At the beginning of the jury charge the judge stated:

> A defendant *is presumed innocent until his guilty is established beyond a reasonable doubt.* A defendant must be acquitted of

the crime *unless the state produces evidence which convinces you beyond a reasonable doubt of every essential element* of the crime or crimes charged . . . (Emphasis supplied).(Tr. 673).

At the end of the jury charge, immediately following the court's instruction on the firearms specification, the judge defined "reasonable doubt" and allocated the burden of proof. The judge stated:

Reasonable doubt is present when the jurors, after they have carefully considered and compared all the evidence, cannot say they are firmly convinced of the truth of the charge. It is doubt based upon reason and common sense. Reasonable doubt is not mere possible doubt . . . Proof beyond reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his own affairs.

\* \* \*

If you find that *the state proved beyond a reasonable doubt all the essential elements of any one or more of the offenses charged in the separate counts in the indictment,* your verdict must be guilty as to such offense . . . (Emphasis supplied)
If you find that *the state failed to prove beyond a reasonable doubt any one of the essential elements of any one or more of the crimes charges in the separate courts in the indictment* your verdict must be not guilty as to such offense . . . (Emphasis supplied)

It is clear from these instructions that the trial court properly defined and allocated the burden of proof as to each element of each crime charged. When the firearms specification instruction is viewed within the broad spectrum of the overall jury charge, we cannot say that the jury was instructed to find Appellant guilty on proof less than reasonable doubt. We overrule Appellant's fourth assignment of error.

### B. Evidence of Firearm Operability

R.C. 2929.71 requires a court to sentence a criminal defendant to three years actual incarceration if he is convicted of having a firearm on or about his person during the commission of a felony. R.C. 2923.13 prohibits a person under disability from possessing a firearm or dangerous ordinance.[10] R.C. 2923.11(B) defines a "firearm" as:

\* \* \* any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant. "Firearm" includes an unloaded firearm, and any firearm which is inoperable but which can readily be rendered operable.

This court has long held that proof of firearms operability sufficient to satisfy the requirements of R.C. 2923.11 may be in the form of circumstantial evidence alone. *State* v. *Hicks* (March 10, 1987), Clark App. No. 2186, unreported; *State* v. *Shank* (July 15, 1986), Montgomery App. No. 9661, unreported. A jury may infer the deadly nature of an instrument from the facts and circumstances of its use. *State* v. *Whorton* (October 20, 1988), Montgomery App. No. 10715, unreported. Testimony that a gun was brandished and pointed at victims and that threats were made to shoot them have been held proof sufficient to satisfy R.C. 2923.11. *State* v. *Street* (November 13, 1987), Montgomery App. No. 10366, unreported.

In this case there is substantial evidence to support a finding that a "firearm" was used, according to the foregoing standards and rules. The victims testified that a gun was brandished and pointed at them. (Tr. 204). Threats were made to injure the victims by firing the gun. (Tr. 210). Threats were made that victims would be killed. (Tr. 212).[11] Appellant Penson ordered Richard Brooks to stay behind and kill the victims. (Tr. 214, 494). All of the foregoing provide substantial evidence of a circumstantial nature to support a finding beyond a reasonable doubt that a "firearm" was employed by Appellant in committing his felonies.

The Ohio Supreme Court has recently reviewed the proof necessary to meet the terms of R.C. 2923.11 beyond a reasonable doubt in *State* v. *Gaines* (1989), 46 Ohio St.3d 65. In that case a charge of aggravated robbery was joined with a firearms specification. Victims testified that they saw a gun in the defendant's hand and that they believed it would fire. However, no testimony was given that the object was pointed or brandished or that any threats were made to fire it.

*Gaines* rejected the notion that the firearm definition of R.C. 2923.11 is satisfied by proof of

a gun as a "deadly weapon" only. The Court distinguished the rule of *State* v. *Vondenberg* (1980), 61 Ohio St.2d 285, pointing out that *Vondenberg* concerned only aggravated robbery and not an additional "firearms" specification turning on R.C. 2923.11. The court was most concerned that the proof show, beyond a reasonable doubt, that, in the statute's terms, the instrument is a "deadly weapon capable of expelling or propelling * * * projectiles by the action of an explosion or combustion propellant." The Court excluded from that category deadly weapons of a similar character or appearance, such as B-B guns, inoperable guns, or toy guns, because they are not capable of the function described in the statute, even though they may be deadly weapons and used in aggravated robberies.

The Court held that proof of a "firearms specification" beyond a reasonable doubt requires proof of operability. That may be done through circumstantial evidence, and introduction of the gun itself is not required. Testimony by witnesses as to the object's appearance and their subjective belief that it was operable is not sufficient. In that respect it might also be a toy gun and fail under the rule of *State* v. *Kulig* (1974), 37 Ohio St. 2d 157, that circumstantial evidence of guilt bear no reasonable theory of innocence.

We conclude that the proof in this case was adequate to satisfy the rule of *Gaines*. Statements and representations made by Appellant in the form of threats to shoot the victims constitute evidence of the gun's operability. Though the threats are circumstantial evidence in relation to that issue, they take the matter out of the realm of *Kulig*, i.e., circumstantial evidence bearing also a reasonable theory of innocence. The statements constitute, therefore, substantial evidence on which the jury could reasonably find that operability was proved beyond a reasonable doubt. In that event we may not reverse the judgment of the trial court.

Appellant's assignment of error number five is overruled.

## VI.
### Jury Instruction on Felonious Assault

Appellant's sixth assignment of error states:

THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY THAT IN ORDER FOR THE JURY TO CONVICT PENSON FOR THE OFFENSE OF FELONIOUS ASSAULT, THE JURY MUST FIND BEYOND A REASONABLE DOUBT THAT PENSON CAUSED OR ATTEMPTED TO CAUSE PHYSICAL HARM BY MEANS OF A DEADLY WEAPON OR DANGEROUS ORDNANCE, THEREBY DEPRIVING PENSON OF DUE PROCESS OF LAW IN VIOLATION OF ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION AND THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND THE RIGHT TO A TRIAL BY JURY IN VIOLATION OF ARTICLE I, SECTION 5 OF THE OHIO CONSTITUTION AND THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

The fact that a trial court omits to instruct the jury on an essential element of a crime is not in and of itself reversible error. As the Ohio Supreme Court stated in *State* v. *Adams* (1980), 62 Ohio St. 2d 151, 154:

* * * a trial court's failure to separately and specifically charge the jury on every element of each crime with which the defendant is charged does not *per se* constitute plain error not does it necessarily require reversal of a conviction. Only by reviewing the record in each case can the probable impact of such a failure be determined, and a decision reached as to whether substantial prejudice may have been visited on the defendant, thereby resulting in a manifest miscarriage of justice.

See also, *State* v. *Kinney* (1987), 35 Ohio App. 3d 84; *State* v. *Young* (1988), 37 Ohio App. 3d 249.

The indictment charged Appellant with two counts of felonious assault under R.C. 2903.11(A)(2) which involves use of a deadly weapon or dangerous ordnance.[12] The trial judge erroneously gave the jury an instruction for simple assault under R.C. 2903.13(A) which does not.[13] Appellant argues that the omission of the essential element of knowingly causing physical harm to James Jones by means of a deadly weapon is plain error. Appellant relies on *Hoover* v. *Garfield Heights Municipal Court* (C.A. 6, 1986), 802 F.2d 168 for the proposition that the "complete and utter failure to inform

the jury of an essential element of the crime of which the petitioner was convicted . . . was a violation of due process."

Id. at 175, quoting *Glenn* v. *Dallman* (1982) 686 F.2d 418, 420.

We find that the omission did not create either substantial prejudice or a manifest miscarriage of justice. *Adams, supra.* The jury was charged to find whether Appellant knowingly caused or attempted to cause physical harm. The jury found that he did so. The record is abundantly full of proof that in the course of those offenses Penson used a gun.[14] Nothing in the record suggests that he did not use a gun.

There is no reason to believe that addition of the element of use of a deadly weapon or dangerous ordnance to the charge given would have changed the result in any way. Though the court erred, the probable impact of that error does not weigh against conviction, is not prejudicial, and does not constitute a manifest miscarriage of justice.

For the reasons stated above, we overrule Appellant's sixth assignment of error.

## VII.
## Sentence Enhancement on Felonious Assault

Appellant's seventh assignment of error states:

THE TRIAL COURT ERRED IN SENTENCING PENSON TO ENHANCED SENTENCES FOR THE OFFENSES OF FELONIOUS ASSAULT, PURSUANT TO R.C. 2929.11 (B) (2) (b), WHEN THE JURY FOUND, WITH REGARD TO THOSE OFFENSES, THAT PENSON HAD NOT PREVIOUSLY BEEN CONVICTED OF FELONIOUS ASSAULT, THEREBY DEPRIVING PENSON OF DUE PROCESS OF LAW IN VIOLATION OF ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION AND THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

R.C. 2929.11(B) (2) provides two alternative patterns of sentencing for persons found guilty of an aggravated felony of the second degree, the distinction being whether the person has been at a prior time convicted of another aggravated felony or murder. If not, subparagraph (a) provides for a minimum sentence on the current conviction of three, four, five, six, seven or eight years to a maximum of fifteen years. If the person does have such a prior conviction, subparagraph (b) provides for a minimums of eight, nine, ten, eleven, or twelve to a maximum of fifteen. A certified copy of the conviction along with sufficient evidence to prove the person identified in the certified copy is the same person on trial constitutes proof of a prior felony conviction. R.C. 2941.142. However, section 2941.142 also provides that an Appellant can elect for the judge to determine the existence of a prior conviction at the sentencing portion of the trial. Thus section 2929.11 (B) (2) (b) must be read in conjunction with section 2941.142.

In this case the jury verdict forms required the jury to make a finding on Appellant's prior conviction. The jury concluded in its verdict on Count Five that Appellant had not been previously convicted of felonious assault.[15] The trial court, however, apparently ignored this finding and sentenced Appellant to a term of twelve to fifteen years. Though not specifically stated in the record, this sentence is consist with the enhancement provisions of R.C. 2929.11 (B) (2) (b).

Since the verdict forms required the jury to determine the existence of Appellant's prior conviction, the trial judge could not ignore the jury's findings. Thus the trial judge could not enhance Appellant's sentence on Count Five since the findings of the jury mitigated against enhancement on this charge.[16] No factual predicate existed to support the trial judge's decision to enhance the sentence.

Appellee argues that the error, if any, is harmless. Appellee also argues that the enhancement provision is purely within the discretion of the judge, the fact of a prior conviction was properly proved at trial, that the Appellant stipulated to the facts, and that Appellant failed to object at trial. We are compelled to reject those arguments. Notwithstanding that R.C. 2929.11 (B) (2) (b) is a sentencing provision, a factual predicate must nervertheless support enhancement of a sentence. As noted above, the jury found that the necessary factual predicate to enhancement, a prior conviction, did not exist as to Count V.

Further, to argue the error that the court committed constitutes harmless error belies the fact that, as a result of the court's error, the Appellant received a stiffer sentence of incarceration. Sentencing Appellant to twelve to fifteen years most certainly affects a

substantial right of Appellant sufficient to constitute plain error. Crim. R. 52 (B). Hence, whether Appellant objected at trial or not is irrelevant in a case of plain error. Crim. R. 52(B).

We find that the trial court erred when it ignored the jury's finding that Appellant had not been previously convicted of felonious assault as to Count V.

We sustain Appellant's seventh assignment of error.

## VIII.

### Conclusion

For the reasons stated above we overrule Appellant's assignments of error one through six. We sustain Appellant's assignment of error seven.

Accordingly, the sentence imposed on Count Five of the indictment is hereby set aside, and as so modified, the judgment is hereby affirmed.

WOLFF, P.J., and KERNS, J., concur.

(Judge Joseph D. Kerns, Retired, Sitting by Assignment of the Chief Justice of the Supreme Court of Ohio).

---

[1] The Supreme Court stated in Swain that "In light of the purpose of the peremptory system and the functions it serves in a pluralistic society in connection with the institution of jury trial, we cannot hold that the Constitution requires an examination of the prosecutor's reasons for the exercise of his challenges in any given case. The presumption in any particular case must be that the prosecutor is using the State's challenges to obtain a fair and impartial jury to try the case before the court." Swain (1965), 380 U.S. at 221.

[2] Black's Law Dictionary states that Court's use the term "'prima facie case' in one of two senses: (1) in sense of the plaintiff producing evidence sufficient to render reasonable a conclusion in favor of allegation he asserts . . ., and (2) courts used 'prima facie' to mean not only that plaintiff's evidence would reasonably allow conclusion plaintiff seeks, but also that plaintiff's case compels such a conclusion if the defendant produces no evidence to rebut it."

[3] Appellant raised the challenge during a recess immediately following the swearing in of the jury.

[4] For example, defendant cites to Duren v. Missouri (1979), 439 U.S. 357 as authority for the fair cross-section rule. Yet Duren also emphasizes that "to establish a prima facie violation of the fair cross-section rule the defendant must show (1) that the

group alleged to be excluded is a `distinctive' group in the community; (2) that the representation of this group in venires from which the juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to systematic exclusion of the group in the jury-selection process." Id. at 364.

[5] The Strickland analysis is similar to the analysis previously adopted by the Ohio Supreme Court in State v. Lyte (1976), 48 Ohio St. 2d 391. The Court stated: "First there must be a determination as to whether there has been a substantial violation of any of Defense Counsel's essential duties to his client. Next, and analytically separate from the question of whether the Defendant's Sixth Amendment rights were violated, there must be a determination as to whether the defense was prejudiced by Counsel's ineffectiveness. " Id. at 396-397

[6] Although we overruled appellant's first assignment of error, we would point out that appellant's counsel made reasonable efforts to seat a jury favorable to appellant. (Tr. 149-150) Further, in closing arguments counsel attempted to construct an alibi and repeatedly emphasized what he believed to be the weakness of the evidence. (Tr. 629-42).

[7] The Ohio Jury Instructions on complicity provide, in part, "The defendant is charged with complicity in the commission of the offense of (specify offense). Before you can find the defendant guilty, you must find beyond a reasonable doubt . . . the defendant . . ." 4 O.J.I. 523.03.

[8] The court charged the jury, "A defendant is presumed innocent until his guilt is established beyond a reasonable doubt. A defendant must be acquitted or a crime unless the state produces evidence which convinces you beyond a reasonable doubt of every essential element of the crime or crimes charged in the indictment or of any lesser offense included within that charge. (Tr. 673).

[9] We would point out that Appellant, in his fourth assignment of error, essentially admits that the trial court instructed the jury that each element of the offense must be proved beyond a reasonable doubt. Appellant states: "In the case at bar, the jury was instructed that in order to find Penson guilty of an offense, the State must prove each element of the offense beyond a reasonable doubt. (Tr.673, 686). Indeed, when instructing the jury as to each offense, with the exception of the having a weapon while under disability, the court instructed the jury that it must find the elements of the offense beyond a reasonable doubt." (Emphasis supplied) Appellant's Brief, pg.49. It strikes us as a contradiction to argue that the judge directed a verdict as to complicity when the Appellant admits that the judge properly instructed the jury on its role and responsibility.

[10] Persons having a disability include fugitives from justice, a person under indictment for a felony, a person convicted of a felony, a person indicted or convicetd of drug trafficking, and drug or alcohol dependant, or a mental incompetent. R.C. 2923.13(A)(1)-(5).

[11] James Jones testified to the following:

> ***Steve Penson hit me up side of the head again with the pistol and after my wife came back out she was all wet and stuff and then he made her get on the bed with me * * * she was crying and stuff like this and he told us to lay face down and left Richard Brooks in there to kill us. He said go ahead and kill them, man, take care of them. At this point they closed the door and they left out.
>
> Q. Who left?
>
> A. John Albert Smith and Steve Penson left and they left Richard Brooks in there with us and he started saying, "Yes, this is it mother fucker. You are going to die. You are going to die."
>
> (Tr. 214) (Emphasis supplied)

Mary Jones testified to the following:

> * * * ok, and I could just hear Mary crying and so one of them, I don't know which one, told the fat one in the blue shirt, told him just go ahead and kill us. Ok, and when he told him to go ahead and kill us, the fat one came back in the room and shut the door and he had a gun.
>
> * * *
>
> Then they left and had the duffel bag and putting all kinds of stuff in the bag and knocking things over and then they left. Then the one, I told you, the one with the blue shirt on, he came over with the gun and put the pillows over our heads like he was going to kill us.
>
> Q. Where were you ?
>
> A. Me and James was laying on the bed.
>
> Q. Where your face up or face down?
>
> A. No, I was laying sideways cause I could feel the pressure of the gun through the pillows, like in my face. (Tr. 493-494) (Emphasis supplied).

[12] Appellant's conviction of felonious assault on Deborah Jones was reversed in State v. Penson (June 5, 1987), Montgomery App. No. 9193, unreported. Thus we need only consider the jury instruction as it applies to the felonious assault of James Jones (Count V). R.C. 2903.11 (A) (2) states:

> (A) No person shall knowingly:
>
> * * *
>
> (2) Cause or attempt to cause physical harm to another by means of a deadly weapon or dangerous ordnance, as defined in section 2923.11 of the Revised Code.

[13] The instruction read: "Each defendant is charged with 2 counts of felonious assault, one on James Jones and one on Deborah Jones. Before you find a defendant guilty of felonious assault you must find beyond a reasonable doubt that on or about the 4th day of August, 1984, and in Montgomery County, Ohio, the defendant knowingly caused physical harm to James Jones or in the other count, Deborah Jones, or aided or abetted their co-defendants in the commission of either or both offenses." (Tr. 683, 684)

[14] For example, James Jones testified, "First, Steve Penson . . . jumped straight through the window . . . and came in and he had a pistol and told us to freeze and set down, everything." (Tr. 204). Later Mr. Jones testified, "And then you know, he was making me say stuff like, 'Go ahead, you ain't shit and say you are a punk mother fucker, go ahead and say you are a fag.' Making me say stuff and he took the pistol, Steve Penson did, and stuck it up in my behind like this and said 'I ought to blow your nuts right off you', using this type language, saying this stuff. (Tr. 210). Jones also testified, "After this Steve Penson came back into the room and said, 'Yes, I know you are going to call the police, mother fucker, but I have got a trick for you. We ain't going to leave no witnesses.'" (Tr. 212). Still later Jones testified, "This time, Steve Penson had struck me up the side of the head several times with the pistol and then after this, he said 'Yes mother fucker, you are going to die.'" (Tr. 212).

Deborah Jones testified, "He [Steve Penson] was telling me to shut up bitch and shut up bitch and then by his time he was pushing James around and just cussing at him and pushing him around and putting the gun to his head . . ." (Tr. 480). Ms. Jones also testified, "Yes: He [Steven Penson] had a gun up to my head now and I was sitting on top the fat one. OK, well, he came back and then he had the gun to my head and he had his penis in my butt . . ." (Tr. 489).

[15] The jury concluded in all other counts that Appellant had been previously convicted of a prior felony. The difference between the jury's determination as to Counts V and VI, and the other counts, would seem the result of a typographical error. The case number of Appellant's prior conviction is 75-CR-144. However, the verdict forms for Counts V and VI listed the prior case number as 74-CR-144.

[16] As noted earlier, we reversed Appellant's conviction on Count Six due to insufficient evidence to support conviction. State v. Penson, supra.